Keven Steinberg, Bar No. 151372
**STEINBERG LAW**
13412 Ventura Boulevard
Suite 380
Sherman Oaks, California 91423
Telephone: (818) 855-1103
Facsimile: (818) 855-1104

Attorneys for Plaintiff
ROBERT GAUDIO

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| ROBERT GAUDIO, *an individual*,<br><br>Plaintiff,<br><br>v.<br><br>CRITICAL MASS INDUSTRIES, *a Colorado Limited Liability Company* D/B/A Good Meds, and DOES 1-100,<br><br>Defendants. | CASE NO. 2:19-cv-08214 MWF-AGR<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES AND RELIEF FOR:**<br><br>1. WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY;<br>2. BREACH OF CONTRACT;<br>3. INTENTIONAL MISREPRESENTATION/FRAUD;<br>4. NEGLIGENT MISREPRESENTATION;<br>5. VIOLATION OF *LABOR CODE* § 2802;<br>6. NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS;<br>7. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS;<br>8. VIOLATION OF *BUSINESS & PROFESSIONS CODE* § 17200 *et seq.*<br><br>**[JURY DEMANDED]** |

Plaintiff, ROBERT GAUDIO, by and through his attorneys ("Plaintiff"), files this

Complaint against Defendants, CRITICAL MASS INDUSTRIES, LLC, doing business as

GOOD MEDS ("Critical Mass"), and DOES 1-100 (hereinafter collectively "Defendants"), for damages and relief and alleges as follows:

## JURISDICTION AND VENUE

1.  This action was removed to Federal Court In or about September, 2019, by Defendants pursuant to this Court's Diversity Jurisdiction under 28 U.S.C. §§1332 and 1441(B).  Since that time, this Court has maintained such jurisdiction.

2.  The Central District of California is the proper venue pursuant to 28 U.S.C §1391(b)(2) because the alleged actions, misconduct, and series of events giving rise to the causes of action set forth herein took place and/or were directed to Plaintiff in the City of Los Angeles, County of Los Angeles, State of California.  Defendants' actions, including their related entities and alter-egos, as herein identified and alleged, were aimed at Plaintiff. Defendants and their related entities and alter-egos knew that Plaintiff would suffer the harm in the City of Los Angeles, County of Los Angeles, State of California.

## PARTIES AND THEIR RELATIONSHIPS TO CALIFORNIA

3.  Plaintiff Robert Gaudio is an individual domiciled in the County of Los Angeles, California. During all times pertaining to the facts alleged herein, Plaintiff resided in the County of Los Angeles, California.

4.  Defendant Critical Mass Industries, LLC is a limited liability company registered in Colorado and doing business as Good Meds.  At all times as alleged herein, Critical Mass operated out of two (2) block long adjoining facilities (over 90,000 square feet) with

its related business X-Sprays.

5.   Critical Mass and X-Sprays not only shared office space, they together shared many employees, services and office equipment and supplies.  Plaintiff also performed services for X-Sprays at the specific directive and request of Critical Mass, with both Critical Mass and X-Sprays compensating Plaintiff for his services in either combined payrolls and wage statements or in disguised separate payments.  Plaintiff is informed and believes that this "combined payroll" system was commonly utilized interchangeably by and between Critical Mass and X-Sprays, including to employees who resided and/or performed services on one or both of their behalves in Los Angeles County, California.

6.   Critical Mass Industries itself and through its intimately related business, X-Sprays, engages in, conducts business and employs (or employed) individuals who resided at all times alleged herein or currently reside in the County of Los Angeles to perform work also in the County of Los Angeles, California.

7.   Other than Plaintiff, such employees include:

a) the hiring and/or using the services of a full time West Coast Sales Executive who resided in Lake Elsinore, California whose services and tasks were performed in and from California and included conducting sales calls within a specific territory, including California and Nevada, and meeting along with Plaintiff as the direct supervisor, with prospective manufacturing partners located in California.

3

b)  the hiring and retention of a marketing company and personnel in Los Angeles, California who solely performed services in Los Angeles and had multiple meetings with Plaintiff in Los Angeles.

8.  Plaintiff's job duties, most of which he performed from his residence in Los Angeles, California  included, but was not limited to direct management and supervision of 20+ employees, some of which resided or worked from Los Angeles, California and included several Directors of which there were weekly Director meetings. Plaintiff was in charge of hiring and firing of various staff, employee reviews and training, implementing new operational procedures, review of financial reports and the accounting process, Defendants' conjoined X-Sprays operation in Colorado and California and more. Plaintiff also had weekly and with some, direct reports, daily communication from California.

9.  Plaintiff, along with Defendants' West Coast Sales Representative who resided and worked out of her home in Los Angeles, California jointly attended meeting also located in the Southern California area, at the direction and control of Defendants. *Reimbursements for these meetings and trips was jointly shared and paid for by Critical Mass and X-Sprays*.

10.  At the request and instruction of Defendants, Plaintiff, along with the West Coast Sales Representative visited farms in Santa Barbara County to purchase and acquire farmland to grow Cannabis and develop manufacturing plants; and to assist with the expansion into the California market, which included operating multiple retail stores using the "GoodMeds"

FIRST AMENDED COMPLAINT FOR DAMAGES AND RELIEF

brand name.  This work too was authorized and directed to take place in Southern California and part of the essential duties of my job.

11.    Also, part of Plaintiff's job duties and taking place at the direction of Critical Mass, were directives for Plaintiff to locate and interview candidates, some of which resided in California for a Chief Financial Officer ("CFO") position and other staff positions with Critical Mass.  As part of these assignments, Plaintiff communicated with, interviewed and met with other candidates in Southern California, who like Plaintiff, also resided in Southern California.

12.  Part of the job functions for this CFO, included working for and providing services for X-Sprays.

13.  At all times alleged herein, a company by the name of Integrated Cannabis Company, Inc. aka ICAN (hereafter, "ICAN") was an investor in, a stakeholder and held significant interests in and to Critical Mass.  This led to ICAN acquiring Critical Mass and Critical Mass's interests, rights and ownership of X-Sprays and its products.  Thus, ICAN, Critical Mass and X-Sprays are for all intents and purposes, a single entity or at least alter egos of one another.  See **Exhibit A** hereto.

14. The true names and capacities of Defendants sued herein as Does 1 through 100, inclusive, are unknown to Plaintiff, who therefore sues such Defendants by such fictitious names. Plaintiff alleges that each fictitiously named Defendant acted or failed to act in such a manner that each has contributed in proximately causing the damages to Plaintiff as

herein alleged. Plaintiff will seek leave of the Court to amend this Complaint to set forth their true names and capacities when ascertained.

15. Plaintiff is informed, believes, and thereupon alleges that each Defendant is now, and was at all times mentioned herein, the agent, principal, partner, joint venturer, employee or alter ego of the other Defendants, and that all of the acts and conduct alleged herein were performed within the course and scope and in the furtherance of such agency, partnership, joint venture, employment or alter ego relationship.

## STATEMENT OF THE FACTS

## PLAINTIFF'S HIRING

16. Plaintiff was the owner of the pet store Pussy and Pooch ("P&P"), located in Beverly Hills, California. Plaintiff closed P&P to work for Defendants as a permanent full-time employee with stock options and benefits.

17. Defendant Critical Mass Industries owns and operates medical dispensaries, which offer cannabis. The company was founded in 2009 and is based in Denver, Colorado, but regularly conducts business in and from Los Angeles, California. Mr. John Knapp is the Chief Executive Officer of Critical Mass Industries. Mr. Chris Lee is the Director of Finance of Critical Mass Industries. Ms. Kate Eckel is the Human Resources Director of Critical Mass Industries. Mr. Clay Kahler, a resident of Los Angeles, California, was initially an investor of Critical Mass and is or was the head of ICAN, a public company (*as later alleged herein, with ICAN acquisition of Critical Mass/X-Spray*

*Mr. Kahler now operates these combined businesses from Los Angeles*). Mr. Kahler and ICAN frequently conduct business in Beverly Hills, California. Mr. John Knapp was the individual who directly hired Plaintiff to work at Critical Mass Industries.

18. Mr. Kahler who resided in and is believed to still reside in Los Angeles, California, was substantially in charge of the operations of Critical Mass. Mr. Kahler's approval was necessary for all significant decisions and business operations and he led the efforts for the merger or acquisition of Critical Mass known and alleged herein as the ICAN deal. Mr. Knapp and Mr. Kahler communicated multiple times daily via phone, text, email regarding the operations and important decisions. Messrs. Knapp and Kahler travelled together for Critical Mass board meetings in Vancouver, and a major trade show in Greece, all of which was for the benefit of Critical Mass.

19. On or about April 2018, Mr. Knapp was in Los Angeles to visit Mr. Kahler. The two visited Plaintiff at P&P in Beverly Hills, California for a meeting. Plaintiff kindly showed Mr. Knapp and Mr. Kahler around his store and pitched his interest to work for them.

20. On or about June 2018, Plaintiff and Mr. Kahler flew to Denver, Colorado and Plaintiff followed up with a written report of his visit. At the meeting, the expressed intent of Defendants (specifically by Mr. Knapp and as recommended by Mr. Kahler) was for Plaintiff to work as a permanent full-time employee for Critical Mass Industries; *for Plaintiff to perform most, if not a majority of his time and work from Plaintiff's home on*

*Los Angeles, California (with minimal travel necessary to Denver)*; to have stock options in the company; and eventually be made an officer.

21. During the meeting, they also had discussions regarding Mr. Kahler's investment, growth of the company, and Plaintiff earning shares in the company. *Specific to these discussion were Defendants comments and representations to Plaintiff that with Mr. Kahler and Plaintiff both residing in Los Angeles, California, that would provide not only Plaintiff and Mr. Kahler a convenient opportunity to work together, but would also be more productive and cost effective for Defendants, by saving travel costs and the like*.

22. On or about August 2018, Plaintiff began working part-time at Critical Mass Industries so that he could meanwhile close P&P. On or about October 1, 2018, Plaintiff became a full-time employee of Critical Mass Industries. Defendants illegally classified Plaintiff as an independent contractor and therefore Plaintiff incurred various costs that were not reimbursed and he was not paid or provided any benefits. Defendants promised to convert Plaintiff to an employee, but never actually did so. This was despite the fact that the nature, scope, and terms of Plaintiff's employment all pointed to an employer-employee relationship, not an independent contractor relationship. Plaintiff was even judged on his performance as an employee, not an independent contractor. Defendants' conduct served to circumvent state and federal tax laws, and was therefore against federal and state law, and a violation of Critical Mass Industries' Employee Handbook, which for example establishes eligibility for health insurance after 60 days of full-time employment.

FIRST AMENDED COMPLAINT FOR DAMAGES AND RELIEF

23. As to Plaintiff's job title, Plaintiff was formally hired to serve as President. Plaintiff was never treated as a consultant or regular employee. Plaintiff was treated as both an owner and executive/officer of the company. Plaintiff's formal title of President was as reflected on his business cards, the official Organization Chart, and introduction to staff members. Plaintiff was assigned to supervise and manage a team of at least twenty (20) subordinates. Further, while Plaintiff was not provided an official job description for the position of President, he was given the job description for the former Chief Operating Officer, for whom Plaintiff took over. Plaintiff did not perform any formal training or transition from the former Chief Operating Officer.

## **PLAINTIFF'S EMPLOYMENT**

24. When Plaintiff began his employment, Critical Mass Industries was operating in many respects illegally, dishonestly, and unprofessionally. There was also a negative and hostile work environment that Mr. Knapp had established and maintained under his leadership. An important objective assigned to Plaintiff and one reason he was hired was to improve company professionalism, as the company severely lacked this on several fronts. Because of the acquisition by a public company (as later alleged herein), Critical Mass needed to in essence grow up and manage its affairs as a professional organization.

25. Upon recognizing the various illegalities, shortcomings, and issues, Plaintiff would bring them to Mr. Knapp, Mr. Kahler, and Defendants' attention, and thereafter would make every effort to implement policies and procedures to correct them.

FIRST AMENDED COMPLAINT FOR DAMAGES AND RELIEF

Defendants, however, preferred to operate illegally, dishonestly, and unprofessionally and therefore retaliated against Plaintiff by terminating his employment. Each time Plaintiff attempted to push Defendants into the right direction, he got a lot of push back, and also witnessed poor company behavior, including in his day-to-day interactions and conversations.

26. Mr. Knapp has a bad history as CEO and Defendants often engage in shady and unethical practices that constitute a violation of federal and/or state law, and Critical Mass' Industries Employee Handbook. At this time, Mr. Knapp is on probation after pleading guilty and paying a fine for a fire department violation.

27. Mr. Knapp would frequently talk poorly about staff, not sparing any details, and often behaved as a disgruntled employee. The Director of Sales even quit because of Mr. Knapp's pattern of verbal abuse toward staff and lack of mutual respect for staff via negative, inappropriate, and unfounded comments. Mr. Kahler expressed many times to Plaintiff that Mr. Knapp seemed burnt-out. He did not want to manage staff, treated them poorly, and distanced himself from them. Mr. Knapp even wanted Plaintiff to take over these tasks. Mr. Knapp would work for home 90% of the time, despite living only five minutes away from the office.

28. Mr. Knapp routinely made decisions as CEO that negatively affected the company. Mr. Knapp and Mr. Kahler never provided formal direction for the company. There was never any written documentation regarding strategy and priorities, which were

only verbally discussed. For example, Defendants' facility was in poor condition and needed lots of repairs. Defendants kept delaying remediation until closure of the ICAN deal, which would in turn bring in money for the repairs. However, these poor conditions were a major part of the reason for the poor growth yields and should have been corrected immediately. Rather than arrange the necessary expenditures, Mr. Knapp blamed the staff and kept accusing others for the poor numbers, which were so bad that there was not even money to buy basic supplies, such as water cups. Despite the company's poor performance, poor working conditions, and inability to afford even the most basic supplies, Mr. Knapp routinely spent company funds for his own benefit and purposes. For example, Mr. Knapp wasted approximately $4,000 per month on an empty apartment, and often spent a lot of money on himself for travel.

29. Mr. Knapp showed a pattern and practice of blaming others for his poor decisions and the following decrease in numbers. For example, prior to Plaintiff's employment, Mr. Knapp and Mr. Kahler decided to change the soil used to grow the plants. This was a major decision based on an intent to improve yields. However, instead of improving yields, the change drastically decreased the yields by 60% and caused a lower quality product to be produced. This in turn caused major problems in terms of retail, as there was less inventory to sell and therefore loss of sales and customers. Mr. Knapp refused to accept blame for these poor numbers and instead accused others for the decrease.

30. Moreover, during his employment, Plaintiff learned that Defendants have a

history of shady accounting practices. Defendants have in the past intentionally misclassified items to avoid taxes, against the explicit advice of their CPA and the Director of Finance. In addition, Defendants routinely incurred major debts, which they did not intend to pay at the time. Such debts were only payable after receipt of funding from ICAN. At one point, Defendants owed $200,000 in payroll and excise taxes to the government. Because of this shady behavior and intent not to pay debts, the accounting team had to deal with daily emails and calls that were harassing in nature from creditors.

31. Under Mr. Knapp's leadership, Defendants created a fake testing environment in an effort to pass tests that they were failing. Defendants forced the staff to move forward with the fake testing environment, despite resistance from staff. Eventually, following much pushback from staff, Defendants dismantled the fake testing environment.

32. When the deal with ICAN was about to close, Defendants wanted to artificially increase the value of monies owed to a few creditors. Therefore, Defendants created fake "consulting invoices" to show that money was owed. These invoices included Mr. Knapp's parents, brother and other close contacts. It was uncertain that any consulting was actually performed, but none were performed during the tenure of the plaintiff." debts were already owed he was trying to get them more money and artificially pumped up the amounts owed.

33. On or about October 2018, Plaintiff met with Dr. Clive Spray, the founder, co-owner and lead chemist of Spray Labs, LLC. Mr. Knapp, Mr. Kahler, Dr. Clive, and Plaintiff had strategy meetings, where the four were portrayed as the leaders of and the

steering committee. In these strategy meetings, they discussed how ICAN on the one hand; and Critical Mass/X-Spray on the other hand would work together to form what they represented would be a global wellness enterprise focused on the development, manufacturing, marketing and distribution of innovative and highly effective botanically-based consumable products with a cannabis focus; which Plaintiff was promised and told that he would run, manage and oversee.

34. During and as a result of Plaintiff's employment, Critical Mass was operating in many respects in accordance with the law and professionally. Indeed, Mr. Knapp told Plaintiff that he was very happy with him and that Plaintiff was by far better than the three previous individuals in Plaintiff's position, i.e., Stormy, Kristi, Stefani, with each of whom Mr. Knapp had a fallout due to his trust issues with staff and general bad history as a leader. Mr. Knapp told Plaintiff that he had been waiting years to find him. When referring to Plaintiff's judgment and abilities, Mr. Knapp told Plaintiff that Plaintiff is "very confident" and has "a good answer for everything."

35. Plaintiff's accomplishments included but were not limited to the following:

a) As to retail, Plaintiff implemented many tools, such as MAP, iBoard, and trackers, and also hired a GM and retrained the team to be more focused on sales. Plaintiff also reorganized the store, which was a mess as far as storage, inventory, SOPs, etc. Plaintiff also weeded out lower performing staff members and did leadership training sessions to improve the

disgruntled team that Defendants had given him.

b) Plaintiff improved staff retention and engagement. He provided a Core Values document, communication plan, staff discount, and staff reimbursement for medical cards.

c) Plaintiff improved distribution, including ordering, delivery schedules, and communication.

d) Plaintiff assisted the Director of Operations with weekly reporting and improving testing, as many tests were failing. With Plaintiff's help, these tests were now passing.

e) Plaintiff assisted with leadership training and organization. Plaintiff hired Kate, Director of HR, to revamp the hiring process by providing job posting and approaches to interviews. Plaintiff helped update job descriptions so that expectations, wages, and fairs were all clear.

f) Plaintiff fixed the company's accounting practices, cleaned up and made accurate the QuickBooks, did budget training and process, and implemented a forecast and operating plan. In addition, Chris, the Director of Finance, had not been reviewed or provided any direction for eight months. Plaintiff provided a review and an action plan. This helped to address the daily angry emails and phone calls from vendors and collection companies.

FIRST AMENDED COMPLAINT FOR DAMAGES AND RELIEF

g) Plaintiff revamped the MIP Sales Position and implemented a start plan that was ready to go for the new hire, who started working the day Plaintiff was fired.

h) Plaintiff worked a detailed restructure plan for ICAN, and gathered pricing for benefits and HR.

i) Because the growth yield was so poor, the company had to buy flower from other companies. Plaintiff implemented a process to acquire new flower, and the company bought as much as it could afford, given the cash flow issues. Plaintiff was forced to buy product on credit, with no intent to pay in the short-term. Plaintiff found a good partner for the credit and started a great working relationship for the company.

j) Plaintiff hired or directed many individuals, leading to improvements within the company. Plaintiff promoted Nick to Manager. Mr. Knapp had been holding Nick back due to a grudge against him. The promotion led to a big jump in the department. Moreover, one of Plaintiff's key hire was Jamie, the Senior Director of Production. Plaintiff created and Jamie executed a very detailed 90-day action plan, which caused great progress for the company.

k) Plaintiff hired Grace, the Director of Compliance, and created a Compliance Department, which did not previously exist. This department

FIRST AMENDED COMPLAINT FOR DAMAGES AND RELIEF

became very instrumental and essential to handle issues with the fire department, renew licensing, and handle the paperwork for the ICAN deal.

l)  Plaintiff did a review of Keenan, the Director of Cultivation and most senior staff. This was the first review of Keenan in 2 years. Plaintiff created a detailed action plan for Keenan and his department, which was previously a very dysfunctional department. Most of the staff wanted to quit due to poor growth yields and change of soil. Despite inheriting a very messy situation and angry team, Plaintiff spent time with them, listened to their concerns, and kept them together.

m) Plaintiff hired freelance staff and managed all marketing efforts, despite a very tight budget.

n)  All of the company's Directors were very junior and underdeveloped. It took Plaintiff a lot of time to get them to trust Plaintiff, especially given the mistrust and mistreatment that was built up by Mr. Knapp. However, Plaintiff initiated and eventually got a lot of progress from them. The staff felt engaged, and happy that they had someone to speak with who actually listened and cared. Nonetheless, Mr. Knapp frequently criticized the Directors regarding their performance and stated that they should all be fired, while also blaming the former Chief Operating Officer.

36. Each time Plaintiff implemented a new project, he would first review it with Mr.

FIRST AMENDED COMPLAINT FOR DAMAGES AND RELIEF

Knapp. Plaintiff kept Mr. Knapp in the loop on daily details and asked for his approval on almost everything. Mr. Knapp would agree with most of Plaintiff's ideas and even provide positive feedback. However, in February 2019, Mr. Knapp started to change his tone and even became curt in his feedback, making statements to Plaintiff such as "you need to do this . . .," "you need to be here more, you are not here enough," "you need to get these people to work longer hours," and "you need to supervise these people."

37. After the VP of Sales for the X-Spray products quit, Plaintiff encouraged Defendants to hire a previous candidate, Melissa, who was hired on February 24, 2019 and thereafter took over Plaintiff's responsibilities related to these products. Plaintiff thanked Mr. Knapp for listening to his recommendations to take away these responsibilities since he had too much on his plate. Plaintiff trained Melissa and was very cooperative in this transition. However, Melissa did not understand certain communications and twice became very hostile against Plaintiff via email. Plaintiff reported these two hostile situations to HR and to Mr. Knapp. However, no investigation or corrective action was taken. This was a violation of Critical Mass Industries' Employee Handbook, which requires investigation of all reports of harassment and implements a "Talk to Us" policy for internal complaints. Instead, shortly after Melissa was hired and Plaintiff trained Melissa, Defendants fired Plaintiff.

38. On or about November 2018, Defendants told Plaintiff to hire a CFO to get ready for the ICAN acquisition. Plaintiff went through approximately 300 resumes and

FIRST AMENDED COMPLAINT FOR DAMAGES AND RELIEF

interviewed over 10 candidates, of which at least 3 very qualified candidates. However, hiring kept getting delayed due to Mr. Kahler's travel out of the country and delay of the deal closing.  At this time, there were many important projects put on hold due to not having a CFO to execute them.  Therefore, Plaintiff took the initiative to be the acting CFO (in addition to his other roles). He learned that the company lacked formal budgets, forecast plans, financial analyses, etc., and the records were a mess. Indeed, the company was designed to hide as much as possible. There were suspect accounting practices and everything was very disorganized. When Plaintiff would push to clean it up and record ethically, he would receive push back from Defendants that was aggressive in tone and insulting in manner.

39. Plaintiff took the initiative to do the following and was very timely on each of these initiatives: yield analysis, MIP dept plan, year-end tax preparation, 2019 operating forecast and operating plan, cash needs plan, etc. Plaintiff completely revamped the accounting department and turned two disgruntled staff members into engaged and accomplished employees reaching results. However, after all of this work was done, Defendants told Plaintiff that he "took too long."  This was despite the fact that the work was supposed to be done by the CFO, not Plaintiff. Defendants should have thanked Plaintiff for his work and efforts. Instead, they took unfairly advantage of his work ethic and treated him inappropriately.

40. Defendants promised Plaintiff funds to fix problems within the company and

expand the company. Plaintiff waited six months for such funds, and meanwhile was very limited in what he could execute and marketing. While the business facilities encompassed over 90,000 square feet which included a separate office and a separate manufacturing facility, Plaintiff was not provided with money to buy even the most basic supplies, including computers, cups, water, and toilet paper. In fact, each of the facilities were in very poor condition and improperly and illegally modified and renovated by Defendants who intentionally ignored and skirted around building codes and permit requirements. Such illegalities were discovered by the local Colorado Fire Department who cited Defendants for these illegal acts and shut down Defendants' ability to use electricity until such time Defendants were in compliance.  Not surprisingly, due to the intentional omission of critical electrical and plumbing equipment and the poor and improper construction thereof, there was no heating or air conditioning, so space heaters were used during what was considered one of the worst winters in years.

41.On or about March 2019, an employee reported illegal conduct to Plaintiff. Specifically, cannabis was being consumed in the workplace, which is against state law and regulation and Critical Mass Industries' Employee Handbook. Plaintiff relayed the information to Mr. Knapp. Defendants acknowledged an issue, but did not want to enforce or disrupt anything. In essence, they looked the other way. Plaintiff did not believe that this was an appropriate response. Thereafter, Plaintiff was fired within a week.

## TERMINATION OF PLAINTIFF'S EMPLOYMENT

42. On or about Monday, March 11, 2019, Defendants terminated Plaintiff's employment. Plaintiff received a call of approximately 30 minutes from Mr. Knapp advising him of the termination.

43. On the termination call, Mr. Knapp said that his deciding factor to terminate was a comment that Plaintiff had made about "not wanting to be a babysitter." Plaintiff made this statement as a reference to his own management style, which is not to micromanage and be a clock watcher. Plaintiff's style is to develop, empower, and provide direction, and then expect results.

44. On the termination call, Mr. Knapp indicated that while it was <u>not</u> important for Plaintiff to move to Denver for his job and that Plaintiff could perform his work mainly from Los Angeles, Mr. Knapp preferred to have Plaintiff occasionally travel to the Denver office where Plaintiff could stay with Mr. Knapp in Denver, instead of a hotel, to save the company money. In addition, Mr. Knapp himself, however, rarely went to the office and facilities and was therefore being a hypocrite.  During that few visits to Denver, Plaintiff did not see Mr. Knapp come in even once and took a lot of time away from Plaintiff's wife and their businesses in Los Angeles.

45. After the termination call, Plaintiff texted Mr. Kahler to discuss the termination with him and get a better understanding as to what happened, and thereafter Mr. Kahler called Plaintiff with Mr. Knapp on the line to discuss. Although he did not seem to know

the details, Mr. Kahler supported Mr. Knapp's decision to fire Plaintiff. Mr. Kahler indicated that he was going by Mr. Knapp's assessment and that the decision had to be supported. Mr. Kahler stated that he was "disappointed" and "had high hopes for [Plaintiff]." Plaintiff felt frustrated and embarrassed since Mr. Kahler had hired him and the firing was damaging to his reputation and business. The two made it seem as though Plaintiff was being fired due to his performance, although his performance was stellar and he had never been fired before. Plaintiff had never received any job reviews or written warnings.  If any issues existed, they were not communicated to Plaintiff and Plaintiff was not provided with any opportunity to cure or remedy them.

46.Defendants fired Plaintiff to retaliate against Plaintiff for reporting illegal conduct and attempting to fix and implement procedures to fix the illegalities and unprofessionalism within the company. Plaintiff had observed and placed Defendants on notice that Critical Mass had been engaging in what appeared to be illegal, fraudulent and deceptive business practices both in Colorado and directed to other States, including California.  These included not only various violations of labor laws, including mis-classifying employees such as Plaintiff, the West Coast Sales Executive and other employees in California (and Colorado) as "consultants" or "independent contractors"; falsifying environmental and product reports required both in California and Colorado, among other states; and diverting company funds for non-business use in California, Colorado and other states.  Other employees and representatives of Critical Mass were also aware of such illegal

FIRST AMENDED COMPLAINT FOR DAMAGES AND RELIEF

activities.

47. Defendants via Mr. Knapp and Mr. Kahler also used Plaintiff as a scapegoat for the poor performance of the company. Mr. Knapp had been engaging in extremely passive and lazy behavior as to the management of the business and therefore it was not as lucrative as had been hoped. Plaintiff was being blamed for the poor performance of the company. At this time, ICAN had become a public company and was therefore under scrutiny for poor results. Defendants needed a scapegoat to show face to investors. The intent was to pass blame and re-organize.

48. Defendants fired Plaintiff without providing any notice, severance, or cause. Due to the commitments of time and efforts required of Plaintiff, Plaintiff had no opportunity to manage his other businesses or income, which declined as a result.  Plaintiff has suffered great difficulty in finding another job, especially one that is befitting for his stature, expertise, and level.

49. Defendants' actions have caused Plaintiff monetary damages and emotional distress, including but not limited to stress, anxiety, lack of sleep, fear, and embarrassment. Defendants' actions have also damaged Plaintiff's reputation. Defendants fired Plaintiff after only seven months. This short period of employment, terminated via firing, has weakened and damaged Plaintiff's resume, record, and credibility in the field, and amongst his colleagues and peers.

FIRST AMENDED COMPLAINT FOR DAMAGES AND RELIEF

## **BREACHED PROMISES TO PLAINTIFF**

50. Defendants made various promises and agreements, by which they intentionally and deceitfully did not abide, causing harm to Plaintiff.

51. Defendants never converted Plaintiff from an independent contractor to an employee. This misclassification was intentional to circumvent certain federal and state tax laws, including local Colorado Cannabis laws and regulations, which required that only Colorado residents be employed at the facilities such as that of Defendants'. Accordingly, because of the misclassification, Defendants did not properly pay or withhold taxes, and also Plaintiff cannot at this time file for unemployment pay. Plaintiff currently has no job or income.

52. Plaintiff's start pay was $150,000. However, Plaintiff made very clear his expectation to earn $150,000-$200,000 per year. Based on Plaintiff's expectation, there was an implicit understanding that Plaintiff's pay would increase with his responsibilities and results. Although Plaintiff's responsibilities grew, his pay never did. Plaintiff became the President of the company, which has approximately $7,000,000 in revenue, and also continued to manage other roles in the company, but Plaintiff was paid only $150,000.

53. Defendants promised Plaintiff shares in ICAN, but never gave Plaintiff any such shares, causing Plaintiff to lose income.

# FIRST CAUSE OF ACTION

## WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

### (Against All Defendants and Does 1 - 100)

54. Plaintiff re-alleges and incorporates herein by reference, as though set forth in full, each and every one of the foregoing allegations.

55. Plaintiff claims that he was fired for reasons that violate a public policy. It is the well-established policy of the State of California, by and through its statutes, common laws, and precedent, that an employer may not retaliate against an employee for disclosing, reporting, or attempting to correct illegal conduct to his employer.

56. Defendants fired Plaintiff to retaliate against Plaintiff for reporting illegal conduct and attempting to fix and implement procedures to fix the illegalities and unprofessionalism within the company. Plaintiff had observed and placed Defendants on notice that Critical Mass had been engaging in what appeared to be illegal, fraudulent and deceptive business practices both in Colorado and directed to other States, including California.  These included not only various violations of labor laws, including mis-classifying employees such as Plaintiff, the West Coast Sales Executive and other employees in California (and Colorado) as "consultants" or "independent contractors"; falsifying environmental and product reports required both in California and Colorado, among other states; and diverting company funds for non-business use in California, Colorado and other states.  Other employees and representatives of Critical Mass were also

aware of such illegal activities.

57. Plaintiff's conduct of continuously disclosing, reporting, and attempting to correct illegal conduct and Defendants' non-compliance with laws and regulations was a substantial motivating reason for Plaintiff's discharge. Defendants' non-compliance was part of an ongoing scheme and course of conduct. Defendants ratified the wrongs and illegalities discussed herein, when it was their duty and within their ability to prevent, remedy, and/or correct these wrongs. Defendants intentionally and willfully failed to ensure compliance with the company's legal duties.

58. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and will continue to suffer damages in an amount in an amount within the jurisdictional limits of this Court and to be proven at trial, including but not limited to financial and emotional harm; lost business opportunities both within Defendants' business (loss of partnership participation, revenue and income and shares and ownership rights) and also with Plaintiff's own businesses in Los Angeles.

59. Defendants willfully, intentionally and deliberately engaged in the foregoing acts so that they could and would continue to freely and without the interference, objections and warnings of Plaintiff, continue with their illegal, fraudulent and deceptive business practices and to be able to hide these activities from other employees and the general public. As such, Defendants are guilty of oppression, fraud, and/or malice under *Civil Code* section 3294, thereby entitling Plaintiff to punitive damages in a sum appropriate to

punish and make an example of Defendants.

## SECOND CAUSE OF ACTION

### BREACH OF CONTRACT

### (Against All Defendants and Does 1 - 100)

60. Plaintiff re-alleges and incorporates herein by reference, as though set forth in full, each and every one of the foregoing allegations.

61. Plaintiff and Defendants entered into a contract in which, in exchange for Plaintiff's full-time employment at Critical Mass Industries, Defendants would 1) classify Plaintiff as an employee and thereby cover expenses and provide benefits, 2) make Plaintiff a long-term/permanent employee, 3) provide Plaintiff with stock options in ICAN, 4) make Plaintiff an officer of the company, and 5) increase Plaintiff's pay with increased responsibilities.

62. Plaintiff did all or substantially all of the significant things that this contract and agreement required him to do, or he was excused from performance.

63. Defendants breached the agreement 1) by failing or refusing to classify Plaintiff as an employee and providing benefits, 2) firing Plaintiff within just seven months of hire, 3) failing to provide Plaintiff with stock options, 4) failing to make Plaintiff an officer of the company, and 5) failing to increase Plaintiff's pay with increased responsibilities.

64. Plaintiff has been harmed and Defendants' breach of contract is a substantial factor in causing Plaintiff's harm.

65. Plaintiff has been generally damaged in an amount within the jurisdictional limits of this Court. Plaintiff prays for damages according to proof at trial for this cause of action, including but not limited to financial and emotional harm; lost business opportunities both within Defendants' business (loss of partnership participation, revenue and income and shares and ownership rights) and also with Plaintiff's own businesses in Los Angeles.

### THIRD CAUSE OF ACTION

### INTENTIONAL MISREPRESENTATION/FRAUD

### (Against All Defendants and Does 1 - 100)

66. Plaintiff re-alleges and incorporates herein by reference, as though set forth in full, each and every one of the foregoing allegations.

67. Defendants fraudulently promised and represented to Plaintiff that, in exchange for Plaintiff's full-time employment at Critical Mass Industries, Defendants would 1) classify Plaintiff as an employee and thereby cover expenses and provide benefits, 2) make Plaintiff a long-term/permanent employee, 3) provide Plaintiff with stock options in ICAN, 4) make Plaintiff an officer of the company, and 5) increase Plaintiff's pay with increased responsibilities.

68. At the time Defendants made these fraudulent promises and representations, Defendants knew them to be untrue and false in that they never intended to abide by them. Rather, Defendants formulated a premeditated plan to fraudulently induce Plaintiff's full-time employment at Critical Mass Industries without proper and just compensation or treatment.

Defendants intended to exploit Plaintiff's efforts and work, and not provide him with the terms of employment that they had promised. Defendants portrayed themselves as an honest, legal, professional, and organized company, when they knew it fact the company was operating illegally, dishonestly, and unprofessionally.

69. In reliance on Defendants' promises, Plaintiff closed his pet store P&P and worked full-time for Critical Mass Industries. Plaintiff even contemplated, if later needed, to live in Denver, Colorado.

70. Plaintiff has been harmed and Defendants' intentional misrepresentation is a substantial factor in causing Plaintiff's harm.

71. Plaintiff has been generally damaged in an amount within the jurisdictional limits of this Court. Plaintiff prays for damages according to proof at trial for this cause of action, including but not limited to financial and emotional harm; lost business opportunities both within Defendants' business (loss of partnership participation, revenue and income and shares and ownership rights) and also with Plaintiff's own businesses in Los Angeles.

72. Defendants have acted willfully, maliciously, oppressively, and with full knowledge of the adverse effects of their actions and with willful and deliberate disregard of the consequences to Plaintiff. As such, Defendants are guilty of oppression, fraud, and/or malice under *Civil Code* section 3294, thereby entitling Plaintiff to punitive damages in a sum appropriate to punish and make an example of Defendants.

# **FOURTH CAUSE OF ACTION**

## **NEGLIGENT MISREPRESENTATION**

### **(Against All Defendants and Does 1 - 100)**

73. Plaintiff re-alleges and incorporates herein by reference, as though set forth in full, each and every one of the foregoing allegations.

74. Defendants negligently, carelessly and recklessly promised and represented to Plaintiff that, in exchange for Plaintiff's full-time employment at Critical Mass Industries, Defendants would 1) classify Plaintiff as an employee and thereby cover expenses and provide benefits, 2) make Plaintiff a long-term/permanent employee, 3) provide Plaintiff with stock options in ICAN, 4) make Plaintiff an officer of the company, and 5) increase Plaintiff's pay with increased responsibilities.

75. At the time Defendants made negligent, careless and reckless promises and representations to Plaintiff, Defendants knew or should have known them to be untrue and false in that they never intended to abide by them. Defendants had formulated a premeditated plan to fraudulently induce Plaintiff's full-time employment at Critical Mass Industries without proper and just compensation or treatment. Defendants intended to exploit Plaintiff's efforts and work, and not provide him with the terms of employment that they had promised. Defendants portrayed themselves as an honest, legal, professional, and organized company, when they knew it fact the company was operating illegally, dishonestly, and unprofessionally.

76. In reliance on Defendants' promises, Plaintiff closed his pet store P&P and worked full-time for Critical Mass Industries. Plaintiff even contemplated, if later needed, to live in Denver, Colorado.

77. Plaintiff has been harmed and Defendants' negligent, careless, and reckless misrepresentation is a substantial factor in causing Plaintiff's harm.

78. Plaintiff has been generally damaged in an amount within the jurisdictional limits of this Court. Plaintiff prays for damages according to proof at trial for this cause of action, including but not limited to financial and emotional harm; lost business opportunities both within Defendants' business (loss of partnership participation, revenue and income and shares and ownership rights) and also with Plaintiff's own businesses in Los Angeles.

79. Defendants have acted willfully, maliciously, oppressively, and with full knowledge of the adverse effects of their actions and with willful and deliberate disregard of the consequences to Plaintiff.  As such, Defendants are guilty of oppression, fraud, and/or malice under *Civil Code* section 3294 and applicable federal law, thereby entitling Plaintiff to punitive damages in a sum appropriate to punish and make an example of Defendants.

## **FIFTH CAUSE OF ACTION**

### **VIOLATION OF LABOR CODE § 2802 *et seq.***

### **(Against All Defendants and Does 1 - 100)**

80. Plaintiff re-alleges and incorporates herein by reference, as though set forth in full, each and every one of the foregoing allegations.

81. When Defendants unlawfully terminated Plaintiff's employment on or about March 11, 2019, they failed to pay him all sums due and owing at the time off termination.

82. Pursuant to *Labor Code* section 2802, it is unlawful for an employer to not indemnify an employee for all necessary expenditures and losses incurred by the employee in direct consequence of the discharge of his duties or obedience to the directions of the employer.

83. Pursuant to *Labor Code* section 2802, subdivision (c), Plaintiff also seeks recovery of all reasonable costs, including but not limited to attorneys' fees incurred by him, to enforce his rights under *Labor Code* section 2802.

## SIXTH CAUSE OF ACTION

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### (Against All Defendants and Does 1 - 100)

84. Plaintiff re-alleges and incorporates herein by reference, as though set forth in full, each and every one of the foregoing allegations

85. As employers, Defendants owed Plaintiff the duty to exercise due care in the ownership, management, and control of the business, including Plaintiff's employment environment and agreement.

86. Defendants failed to exercise due care in engaging in the foregoing conduct.

87. Plaintiff is informed, believes, and hereon alleges that Defendants knew, or should have known, that their failure to exercise due care would cause Plaintiff severe

emotional distress.

88. As a direct and proximate result of Defendants' breaches Plaintiff has suffered severe emotional distress in an amount within the jurisdictional limits of this Court and to be determined at trial.

89. As a direct and proximate result of Defendants' breaches. Plaintiff as suffered general and consequential damages in an amount within the jurisdictional limits of this Court and to be determined at trial.

## SEVENTH CAUSE OF ACTION

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (Against All Defendants and Does 1 - 100)

90. Plaintiff re-alleges and incorporates herein by reference, as though set forth in full, each and every one of the foregoing allegations

91. Defendants' conduct of discriminating and retaliating against Plaintiff was extreme and outrageous in that Defendants knew that their failure to act in this regard would cause Plaintiff mental torment and grief. Defendants' conduct was deliberate and willful and done in reckless disregard of causing Plaintiff emotional distress.

92. As a direct and proximate result of Defendants' conduct, Plaintiff suffered extreme mental anguish and emotional distress damages in an amount within the jurisdictional limits of this Court and to be determined at trial.

93. Defendants willfully, intentionally and deliberately engaged in the foregoing acts

so that they could and would continue to freely and without the interference, objections and warnings of Plaintiff, continue with their illegal, fraudulent and deceptive business practices and to be able to hide these activities from other employees and the general public.  As such, Defendants are guilty of oppression, fraud, and/or malice under *Civil Code* section 3294 and applicable federal law, thereby entitling Plaintiff to punitive damages in a sum appropriate to punish and make an example of Defendants.

## EIGHTH CAUSE OF ACTION

## VIOLATION OF BUSINESS & PROFESSIONS CODE § 17200, *et seq.*

## (Against All Defendants and Does 1 - 100)

94. *Business and Professions Code* § 17200 *et seq.*, provides that unfair competition shall mean and include "all unlawful, unfair or fraudulent business act or practices and unfair, deceptive, untrue or misleading advertising."

95. Plaintiff is informed and believes and thereon alleges that Defendants have engaged in unfair competition in violation of *Business and Professions Code* § 17200 *et seq.*, by 1) refusing to classify him as an employee despite the employment relationship, 2) retaliating against him for reporting illegal activity, and 3) ignoring and refusing to correct his reports/complaints regarding harassment, and non-compliance with laws and regulations.

96. Such business practices are also a violation of California public policy. The maintenance of such unfair business practices allows Defendants to maintain an unfair

advantage over other companies which comply with the applicable laws and regulations, and public policy.

97. Defendants fall within the definition of "person" as set forth at *Business and Professions Code* sections 17203 and 17506.

98. The unlawful, unfair, and fraudulent business practices of Defendants and the Doe Defendants described above present a continuing threat to members of the public in that Defendants are deceiving consumers and depriving them of insurance-related rights.

99. Pursuant to *Business and Professions Code* section 17203, Plaintiff seeks an order from this Court that: A) Provides injunctive and declaratory relief finding that Defendants have violated the provisions of *Business and Professions Code* section 17200 *et seq.*; and B) For an order enjoining Defendants and their respective successors, agents, servants, officers, directors, employees, and all other persons acting in concert with them, directly or indirectly, from engaging in conduct which violates *Business and Professions Code* section 17200 *et seq.*

WHEREFORE, Plaintiff prays for judgment against Defendants and the Doe Defendants as follows:

1.    For general and compensatory damages, including prejudgment interest, in an amount within the jurisdictional limits of this Court and in accordance with proof at time of trial;

2.    For lost salary, both front and back pay, bonuses, and any other benefits, and

FIRST AMENDED COMPLAINT FOR DAMAGES AND RELIEF

expenses, to which Plaintiff would have been entitled to by reason of his employment with Defendants, according to proof;

3. For punitive damages where so permitted and to be determined at trial;

4. For Plaintiff's costs and attorneys' fees;

5. For restitution and/or disgorgement of all ill-gotten gains (on the 8th Cause of Action only)

6. For preliminary and permanent injunction against Defendants from the acts of unfair competition as described in the 8th Cause of Action; and

7. For any such other and further relief as the Court may deem just and proper.


Dated:        December 23, 2019              /s/ *Keven Steinberg*
                                             Attorneys for Plaintiff
                                             Robert Gaudio


## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial of each and every claim and issue in this case.

Dated:        December 23, 2019              /S/ *Keven Steinberg*
                                             Attorneys for Plaintiff,
                                             Robert Gaudio